MARY CAPEHARDT, Respondent, v. SAMUEL MURTA et al., Appellants.

St. Louis Court of Appeals, April 2, 1912.

1. **MASTER AND SERVANT: Establishing Relation: Sufficiency of Evidence.** Evidence, in an action against two defendants for the death of plaintiff's husband while working for them on a farm, *held* to sustain a finding that defendants were joint employers of decedent, and that the relationship of master and servant existed between defendants and decedent.

2. **NEGLIGENCE: Pleading: Res Ipsa Loquitur: Effect of Pleading Specific Negligence.** In a negligence case, where the plaintiff pleads specific acts of negligence in his petition, the *res ipsa loquitur* doctrine is not available to him, and it devolves upon him to prove one or more of the negligent acts pleaded.

3. ———: Established by Inference: Res Ipsa Loquitur. Negligence may be reasonably inferred from the facts and circumstances in evidence, irrespective of the presumption raised by the *res ipsa loquitur* doctrine.

4. MASTER AND SERVANT: Injuries: Evidence of Negligence. In an action for a servant's death, while putting up hay, by the hayfork falling upon him, the mere fact that the rope to which the fork was attached gave way would not be sufficient to sustain a charge of negligence that the rope was not securely fastened at the place it gave way.

5. ———: ———: ———: Sufficiency of Evidence. In an action for a servant's death, while putting up hay, by the hayfork falling upon him, evidence *held* sufficient to sustain a finding that defendants were negligent in failing to properly fasten a rope to which the fork was attached.

6. ———: ———: ———: ———. In an action for a servant's death, while putting up hay, by the hayfork falling upon him, by reason of a rope to which the fork was attached not being properly fastened, *held* that the evidence was conflicting as to whether or not decedent refastened the rope attached to the fork, after it had been fastened a few days before the accident under defendant's direction, and hence the question was one for the jury.

7. ———: Establishing Relation: Evidence. In an action for a servant's death while at work on a farm, in which plaintiff claimed that decedent was jointly employed by the two defendants, one of whom was in charge of the farm, evidence that the defendant who was not in charge paid some of the farm hands in cash for labor on the farm within the time that both defendants were claimed to be operating it was admissible to show its joint operation.

Appeal from St. Louis City Circuit Court.—*Hon. James E. Withrow,* Judge.

AFFIRMED.

*Schnurmacher & Rassieur* for appellants.

(1) The plaintiff should have been nonsuited at the close of plaintiff's case, or the court should have directed a verdict for the defendants at the close of the whole case, because there was no proof whatever of any defect in the hayfork or the rope to which it was attached, or of any negligence in the manner in

which they were fastened. And plaintiff's case was not helped out by the doctrine of *res ipsa loquitur,* because that rule of evidence has no application in a case of this character between master and servant. Klebe v. Distilling Co., 207 Mo. 480; Oglesby v. Railroad, 177 Mo. 272; Sappenfield v. Railroad, 91 Cal. 48; Duntley v. Inman, 42 Ore. 334; Higgins v. Fanning, 195 Pa. St. 599; Green v. Power Co., 75 S. C. 102; Moore Lime Co. v. Johnston, 103 Va. 84; Bergman v. Altman, 127 Ia. 693; Grant v. Railroad, 133 N. Y. 657; Davidson v. Davidson, 46 Minn. 117; Welsh v. Cornell, 168 N. Y. 508; Glasscock v. Swafford Bros. Co., 106 Mo. App. 657. (2) More especially will the rule of evidence, *res ipsa loquitur,* not apply, where the allegations of negligence are specific. Even between common carrier and passenger, where the rule is applied to its fullest extent, it will not avail where the complaint is based on specific, and not on allegations of general, negligence. Cooper v. Realty Co., 224 Mo. 709; Gardner v. Railroad, 223 Mo. 389; Kirkpatrick v. Railroad, 211 Mo. 68. (3) The hayfork and rope were simple contrivances, entirely unlike complicated machinery, and with which the deceased employee was as familiar as his employer; they were used by him in the discharge of ordinary and simple duties and he knew as much about their use as did his employer. The employer was under no more duty to inspect and examine these simple tools than to inspect or examine a hammer, a ladder or a saw. Steinhauser v. Spraul, 127 Mo. 541. (4) The hayfork and rope were in constant view of the employee. They were in nowise obstructed, and the evidence shows they were in nowise defective. The employee assumed all risks incident to his employment and especially all patent and observable dangers. Coin v. Lounge Co., 222 Mo. 488; Steinhauser v. Spraul, 127 Mo. 541. (5) The undisputed evidence shows that the deceased himself tied the rope which became unfastened; but

even if the proof were that it was tied by his fellow-
servant, Carey, or even by the defendant, Paul Murta,
himself, there was absolutely no evidence that it was
negligently or carelessly tied. (6) There was no evi-
dence in the case of any employment of the deceased
by the defendant, Samuel Murta. (7) The court erred
erred in permitting plaintiff, against the objections
of defendant, Samuel Murta, to show: (a) That he
made payments of wages to A. C. White at a period
prior to the time when Paul Murta took charge of the
farm; (b) In permitting White to testify that defend-
ant, Samuel Murta, admitted ownership of the farm;
(c) In permitting plaintiff to read in evidence several
deeds showing ownership of the farm in defendant,
Samuel Murta; and (d) In permitting plaintiff to
read to the jury the deed showing ownership in wit-
ness, White, of the farm adjoining the Murta farm.

*Richard A. Jones* for respondent.

(1) (a) The evidence of plaintiff established that
the knot which loosed and allowed the rope to pull
through the eye in the carriage, and drop the fork
which caused the death of Capehardt, was tied by Dan
Carey, and that was done under the instruction and di-
rection of defendant, Paul Murta. This, the latter
part of the week preceding Wednesday, July 21, 1909,
when Capehardt was killed. The mere loosing of the
knot was, under all the circumstances, prima facie ev-
idence of negligence in failing to properly secure it.
Folk v. Schaeffer, 186 Pa. 253; Graham v. Badger, 164
Mass. 42; Griffin v. A. R. Co., 148 Mass. 143; Benedict
v. Railroad, 104 Mo. App. 218; Jones v. Railroad, 178
Mo. 528; Fitzgerald v. Railroad, 6 L. R. A. (N. S.)
337. (b) The evidence as to the manner in which the
knot was tied clearly discloses negligence in such re-
gard. (c) Carey in the tieing of the knot was a vice-
principal and his act in so doing was that of the mas-

ter. Jones v. Packet Co., 43 Mo. App. 398; Steube v.
Foundry Co., 85 Mo. App. 640; Haskell v. Anchor
Works, 4 L. R. A. (N. S.) 220. (2) The court, from
the testimony of Samuel Murta himself, might prop-
erly have peremptorily instructed the jury that Cape-
hardt was an employee of both defendants. McMahon
v. Davidson, 12 Minn. 357; Midgette v. Mfg. Co., 64 S.
E. 5; Plummer v. Frost, 81 Mo. 425; Lengle, v. Smith,
48 Mo. 276; Gorbert v. Jeffrey, 161 Mo. 645; Steck-
man v. Bank, 126 Mo. App. 664; Jones v. Stever, 136
S. W. 16.

NORTONI, J.—This is a suit for damages ac-
crued to plaintiff, under the wrongful death statute,
through the negligence of defendants. Plaintiff re-
covered and defendants prosecute the appeal.

Plaintiff's husband, Walter Capehardt, came to
his death by means of a hayfork falling upon him
while in the service of defendants and engaged in the
line of his duty in unloading a load of hay. The evi-
dence tends to prove that the two defendants jointly
operated a farm in Crawford county, and that plain-
tiff's husband was in their employ as a farm hand at
the time of his injury and death. It is argued that,
while the evidence amply supports the finding that
defendant Paul J. Murta was the employer of plain-
tiff's husband, it is insufficient to sustain the judg-
ment against his codefendant, Samuel Murta, touching
the same relation, but we do not accede to this view.
It appears that defendant Samuel Murta owned the
farm of 411 acres, in Crawford county, but resided in
the city of St. Louis. In the early part of 1906, Sam-
uel Murta placed his nephew, Paul J. Murta, who
was then a youth seventeen years of age, in charge
of the farm, under some kind of an arrangement for
a division of the net profits. While the precise rela-
tion Samuel Murta sustained toward the operation and
control of the farm is not conclusively shown, there

is certainly sufficient in the record to sustain the finding that he was both jointly interested therein and the joint employer, with Paul J. Murta, of plaintiff's husband. At the time Paul J. Murta was placed upon the farm, there was given into his possession thereon by his uncle and codefendant, eleven head of cattle, forty head of sheep, twenty-four head of goats and from fifteen to eighteen head of horses. The two Murtas testified that Paul was to operate the place on his own account and divide the net profits with his uncle, and at the expiration of twelve years he was to have a one-half interest in the land as well. But it appears from the testimony of all of the witnesses that a bank account was kept in the People's Bank at Cuba in the name of Samuel Murta, the uncle, and plaintiff's husband, as well as the other farm hands, was paid from this by means of checks drawn thereon signed, "Samuel Murta, per Paul J. Murta." It is said that this money in the bank was that of Paul J. Murta alone, but the evidence is that all of the income from sales of stock and other products of the farm was deposited in this bank, during all of the years involved, in the name of Samuel Murta and checked out as above stated. That Samuel Murta owned an interest in this stock on the farm is not denied. While Samuel Murta says that he instructed the bank to turn the account over to his nephew, Paul J. Murta, and that he did not know it continued in his name, he says, too, that he saw some of the returned checks which were signed as above indicated. Touching this matter, the following questions and answers appear: "Q. You never saw any checks? A. I saw some of them returned. I did not know that it made any difference. Q. You didn't care whether signed Samuel Murta, per P. J. Murta or P. J. Murta, alone? A. It didn't make any difference." When these answers are considered, together with the circumstances of the case, there is an abundance in the evidence authorizing the

jury to find that Samuel Murta knew the course of
dealing with respect to the bank account, and he him-
self testified that checks received on account of sales
of property and proceeds of the farm were deposited
in the same account in the People's Bank at Cuba.
Furthermore, one witness testified that Samuel Murta
personally paid him his wages in cash for labor per-
formed on the place during the period that Paul J.
Murta was in charge. This witness testified the pay-
ments were made to him by Samuel Murta in cash,
"I think during the last winter I worked there, about
four years ago, the payments were made once a
month." This testimony was given on November 17,
1910, and payments made four years before that date
by Paul J. Murta fall within the period the farm was
being operated under the immediate charge of Paul
Murta, the nephew. Though the arrangement between
the Murtas contemplated a division of the profits, as
appears from all the evidence, we will not undertake
to determine whether or not a partnership relation
existed between the defendants, for the evidence is ex-
ceedingly meager as to a division of the losses as
well. The parties are not sued on the theory of a
partnership but as though they were in some way
jointly operating and conducting the farm, and that
the plaintiff's husband was in the employ of both
jointly at the time of his injury and death. Obviously,
there is sufficient in the evidence to warrant the jury
in finding that the defendants jointly operated the
farm and that Walter Capehardt was in the employ
of both. While Paul J. Murta, a single man, board-
ing with a family on the farm, was in immediate
charge, it appears that his uncle, Samuel Murta, dur-
ing all of the years, visited the farm every three weeks
on Sunday and remained there until Tuesday. On each
occasion, Samuel Murta engaged himself in looking
over the farm and advising his nephew concerning
the same. From these facts and the fact that Walter

Capehardt and others received their wages by means of checks signed, "Samuel Murta, per Paul P. Murta," the jury were justified in finding that the relation of master and servant existed between both of the defendants and plaintiff's husband. Especially is this true when all of the collateral facts and circumstances in proof are considered in aid of the verdict.

The more important question in the case and that upon which particular stress is laid relates to the. proof of negligence against defendants. At the time of his injury, plaintiff's husband was upon a load of hay operating a hayfork affixed to the end of a rope, suspended about twenty-five feet above on a rigging which operates on a track and carries the hay into the barn. The hayfork was suspended from above by means of a new manila rope, said to be one inch in diameter. This rope was passed through. and made fast in an eye attached to the rail, which ran beneath the cone of the roof of the barn. Because of the insecure manner in which the rope was fastened after passing through the eye, the hayfork, instead of responding to the jerk of the trip rope in the hands of Capehardt on the load of hay, fell upon his neck and occasioned his subsequent death. In other words, upon Capehardt pulling down upon a small rope, known as the trip rope, the knot or fastening on the inch rope, which suspended the pully and hayfork, gave way at the place where it passed through the eye in the rigging above and precipitated the fork together with the rope upon Capehardt in such a manner as to occasion his death.

The petition describes the situation and sets forth a number of specific acts of negligence on the part of defendants concerning the condition of the rope and the knot therein and their omission to furnish an arrangement of sufficient strength, properly inspect the same, etc., etc. Among other things it is charged that defendant omitted to exercise ordinary care in respect

to securely fastening the rope at the place where it gave way. The pleader, having averred several spe-. cific acts of negligence in his petition and pointed out the particulars in which the obligation to exercise ordinary care for the safety of plaintiff's husband was breached, the presumption of negligence involved in the phrase, *res ipsa loquitur,* is not available as prima facie evidence of fault on the part of defendants, and it, therefore, devolved upon plaintiff to show by the facts and circumstances in evidence at least one of the breaches of duty specified in the petition. [Gibler v. Q. O. & K. C. R. Co., 148 Mo. App. 475, 128 S. W. 791; Cooper v. Century R. Co., 224 Mo. 709, 123 S. W. 848.] Because of this, it is earnestly argued that plaintiff's cause should fail, for, it is said, the record is devoid of evidence other than the giving way of the rope itself at the point of the knot, suggesting negligence on the part of defendants. There is, as we understand it, a marked distinction between the presumption afforded by the law in the doctrine *res ipsa loquitur* and a legitimate inference of negligence that may be gathered by the jury from the facts and circumstances in proof which surround and touch upon the alleged breach of duty. Where negligence thus appears as a reasonable inference from the facts and circumstances before the jury, it may be found therefrom to exist, wholly aside from the presumption above mentioned. In such cases, the facts and circumstances affording reasonable inferences to the effect that defendants breached their duty are suficient to cast the onus of exculpation from fault upon the adverse party and make a prima facie case. [See 1 Shearman & Redfield, Negligence (5 Ed.), secs. 57, 58.] It is true that the mere showing the rope gave way at the point where the knot was tied to prevent it slipping through the eye would not suffice on the pleadings here to sustain the charge of negligence laid against defendants, but upon carefully scrutinizing the evidence, it ap-

pears the witnesses detailed with great care how the rope was fastened and from this the jury were certainly authorized to find negligence as a fact. The rope is said to have been a new manila rope one inch in diameter. It passed through an eye in the rigging and suspended the pulley twenty-five or twenty-six feet above the ground. Over this pulley another rope operated, by means of a horse attached, and lifted the hayfork, engaged in the hay, to the barn loft above. To render it secure, the rope suspending the pulley should have been made fast by a knot at the end to prevent its slipping under the weight of the fork laden with hay. The evidence tends to prove that it was difficult to tie a knot in this new manila rope and, therefore, the end was doubled over or lapped and wrapped with a wire and a quarter-inch rope, which was interlaced through the body of the main rope. This doubling over and wrapping and lacing of the rope created what the witnesses described in the evidence as a "bunch" on the end of it, which, if rendered sufficiently secure, would prevent its giving way or slipping through the eye. About a week before plaintiff's husband was injured, Paul Murta in company with Pennell, a carpenter, properly fastened the rope through the eye and made it fast. Paul Murta says that on that occasion "We doubled the rope back in a double and wired it and twisted fibers in it and the twine ran into the knot good and solid." It appears from this that the rope thus doubled had been not only tied but wired as well, to the end of making the "bunch" thereon secure. Afterwards, on the Saturday before plaintiff's husband was injured, Carey, under the direct orders and supervision of Paul J. Murta, refastened the rope in a different way without employing the wire as before. Instead of using the wire, this witness said he used a quarter-inch rope and put it through the strands but once. When it is remembered that this new manila rope was thus

fastened for the purpose of suspending an iron hay-
fork, on which was to be lifted large quantities of hay
into the barn loft, without taking the precaution to
wrap it with wire as before, we believe the jury were
amply justified in finding negligence as a matter of
fact pertaining to the manner in which the rope was
fastened. It would seem to be a legitimate inference
that it was careless to fasten a rope suspending a hay-
fork and pulley in such a manner, especially in view
of the fact that another rope operated on the pulley
to which a horse was attached, raising large quantities
of hay into the barn day after day. Each recurring
movement of hay by the operation of the pulley with
the horse necessarily disturbed the ''bunch,'' created
on the new rope by merely doubling it over and wrap-
ping it with one of smaller dimensions, and this cir-
cumstance alone suggested that ordinary care required
something more should have been done to secure the
''bunch'' from giving way. We believe there is an
abundance in the facts and circumstances authorizing
the jury to find defendants were negligent as a matter
of fact.

But it is argued one witness, Carey, testified that
Capehardt himself refastened the rope on the Monday
preceding his injury on Wednesday, and that the fas-
tening made under the directions of Paul J. Murta by
Carey the Saturday before is beside the case. It is
said that in view of this uncontradicted testimony of
Carey, to the effect that Capehardt fastened the rope
on Monday, plaintiff's husband should be treated as
having assumed the risk of injury which resulted from
his own fault in making an insecure fastening. It is
unnecessary to examine the suggestion of assumed
risk predicated on such uncontradicted testimony, for
the question is not in the case. The argument assumes
a false predicate to the effect that Carey's testimony
touching this matter was uncontradicted. In rebuttal,

two witnesses for plaintiff spoke on the subject in a manner to cast doubt upon the statement of Carey and, therefore, remitted that matter to the jury for consideraion. McConnell was present when the rope was tied the Saturday before under the directions of Paul J. Murta, and this witness gave testimony in rebuttal for plaintiff to the effect that two or three days after Capehardt's death he inquired of Carey if the rope had been retied by anyone after the time which it was tied in his presence. In answer to this question, the witness said, "No, it had not been retied." He said, "when I saw him tie it, it was the last time it was tied until Walter Capehardt was killed." It will be remembered that Carey himself tied the rope under the direction of Paul J. Murta the Saturday before. Touching this, Seeman testified in rebuttal for plaintiff as follows: "After Capehardt was killed, about a week after, I had a talk with Dan Carey on the Murta farm. He said, 'I am sorry I tied the knot.'" When the evidence of these two witnesses, which tends to directly contradict the evidence of Carey that Capehardt tied the knot on Monday, is considered, it is obvious that the case may not be treated as though it concedes Capehardt himself tied the knot.

To the end of showing that both defendants were engaged jointly in operating the farm, plaintiff introduced evidence tending to prove that Samuel Murta paid some of the farm hands in cash for labor performed thereon. One witness testified touching this matter that Samuel Murta paid him cash for his labor several times. He was then asked when such payments were made to him and in answer to this question said, "It was during two different winters that I worked there. I think four or five years ago." This evidence was objected to, and it is argued it was improper because, if five years before, then it antedated the arrangement under which the two Murtas were operating the farm. But the witness immediately

qualified his statement as appears from the very next answer given. He said, "I don't recollect; quite a number of times. I think during the last winter I worked there, about four years ago. The payments were made once a month." The testimony objected to and thus modified tends to show that payments were made by Samuel Murta in cash to the witness within the period during which the two defendants were oper- ating the farm jointly, and it was competent for that purpose.

We have examined other arguments advanced concerning objections to the testimony as well as those leveled against the instructions but find them without sufficient merit to warrant discussion in the opinion. The judgment should be affirmed. It is so ordered. *Reynolds, P. J.,* and *Caulfield, J.,* concur.